**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Wayne P. Taillefer,                                    **Civil No. 14-1281 (SRN/SER)**

        Plaintiff,

v.                                                                     **REPORT & RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

        Defendant.

---

      Fay E. Fishman, Esq., Peterson and Fishman, P.L.L.P, Minneapolis, Minnesota, for Plaintiff.

      Pamela A. Marentette, Esq., Office of the United States Attorney, Minneapolis, Minnesota, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Wayne P. Taillefer ("Taillefer") seeks review of the Acting Commissioner of Social Security's ("Commissioner") denial of his application for disability insurance benefits ("DIB"). *See* (Compl.) [Doc. No. 1]. The parties filed cross-motions for summary judgment. (Pl.'s Mot. for Summ. J.) [Doc. No. 20]; (Def.'s Mot. for Summ. J.) [Doc. No. 22]. For the reasons set forth below, the Court recommends granting in part and denying in part Taillefer's Motion for Summary Judgment and denying the Commissioner's Motion for Summary Judgment.

## I.    BACKGROUND

### A.    Procedural History

      Taillefer filed his application for DIB on March 14, 2011. (Admin. R.) [Doc. No. at 17 219]. Taillefer cited an alleged onset date ("AOD") of September 5, 2010, and his date last

insured ("DLI") was March 31, 2011. *See* (*id.* at 314). Taillefer claimed disability as a result of severe mental and physical impairments, including traumatic brain injury, bulging discs in his spine, osteoarthritis, migraine headaches, high blood pressure, and depression. (*Id.* at 84, 108). Taillefer's claim was denied initially and upon reconsideration. (*Id.* at 149, 155). Taillefer appeared via video before Administrative Law Judge Thomas M. Randazzo (the "ALJ") on January 24, 2013. (*Id.* at 30). The ALJ denied benefits to Taillefer. (*Id.* at 21). Taillefer filed a Request for Review to the Social Security Appeals Council, and the Appeals Council denied Taillefer's request for review, rendering the ALJ's decision final. (*Id.* at 1–4); *see* 20 C.F.R. § 404.981. This lawsuit was initiated on April 25, 2014. (Compl.).

### B.    Taillefer's Background and Testimony

At the AOD, Taillefer was forty-six years old, making him a younger person. *See* (Admin. R. at 219); 20 C.F.R. § 404.1563(c). He is a high school graduate and speaks English. (Admin R. at 20). Taillefer testified regarding a work-related accident that occurred in 1994, during which he suffered a head injury. (*Id.* at 37). He continued to work for the same employer until 2001, but testified that he was never able to "get back to full time." (*Id.* at 41). From September 2007 to October 2009, Taillefer worked as a van driver for a vocational program. (*Id.* at 302, 304). He also worked as a field office manager for the Census Bureau from November 2009 to September 2010. (*Id.* at 302, 303). Taillefer stated that he did limited work setting up sound and lighting equipment for bands from 2002 to 2005 or 2006, but that doing this work caused him a lot of pain. (*Id.* at 49–53). He was a musician until at least mid-2011, but, in light of his physical pain, was no longer performing at the time of the hearing. (*Id.* at 49, 77–78).

Taillefer stated that his physical impairments involved his left eye, which could not track correctly, back pain, which impacts his ability to stand and sit, and pain in both legs. (*Id.* at 37,

44). Back pain is his most severe problem, and it forces him to lie down for extended periods of time. (*Id.* at 45). Taillefer also stated that he experienced vertigo and insomnia and that he is unable to read for long periods of time. (*Id.* at 38, 44). Additionally, he testified that he was diagnosed with depression, causing suicidal ideation, and that "[he] can't count on [his] brain from one day to the next." (*Id.* at 45). Taillefer stated that medications helped, and that without the medications he would have killed himself. (*Id.* at 46). Taillefer's three sons live with him. (*Id.*). He testified that once his sons move out and are no longer there to help him with things like cooking and laundry, "[he has] no idea how [he is] going to stay in [his] house." (*Id.* at 46–49).

### C.     Relevant Medical Record Evidence

#### 1.     Before September 5, 2010 (AOD)

As noted above, Taillefer suffered injuries in a work-related accident in 1994. *See, e.g.*, (*id.* at 37, 366, 408). From late 2006 to late 2007, Taillefer received mental health care from Jana Reinhart, PhD ("Dr. Reinhart"), and Carlos Schenck, MD ("Dr. Schenck"). (*Id.* at 383–409). He saw Dr. Reinhart approximately eighteen times during this time period, experiencing various levels of psychological distress. (*Id.* at 383–403). He saw Dr. Schenck approximately four times for medication management. (*Id.* at 404–09).

In June 2006, Taillefer was seen for right knee and ankle pain. (*Id.* at 380). An MRI of his right ankle revealed "mild chondromalacia." (*Id.* at 382). Taillefer saw Deborah Daniels, RPA-C ("Daniels"), in August 2006 regarding chronic pain at Noran Neurological Clinic, P.A. (*Id.* at 373). His gait was normal, though he had tenderness and decreased range of motion in various areas of his back. (*Id.* at 374). Richard Golden, MD ("Dr. Golden"), also of Noran Neurological Clinic, P.A., saw Taillefer in November 2006 for a medication check. (*Id.* at 372).

Taillefer noted increased pain in his head and neck. (*Id.*). He used a cane and his gait was antalgic. (*Id.*).

In January 2007, Taillefer saw Daniels regarding chronic pain. (*Id.* at 369). His gait was normal and his muscle tone and bulk were normal, though he experienced decreased range of motion and tenderness in his back. (*Id.* at 370). An MRI taken in December 2007 showed "no interval change" in Taillefer's spine when compared to a March 2006 examination, and no evidence of disc herniation or spinal stenosis. (*Id.* at 486). The MRI did show mild disc bulging with marginal spurring at the L3–4 level.[1] (*Id.*). In January 2008, Taillefer saw Dr. Golden regarding back pain and headaches. (*Id.* at 488). The following month, Dr. Golden performed a steroid injection in Taillefer's lower back in an effort to address pain. (*Id.* at 485, 488).

In October 2009, during visits with Deborah Osgood, PA-C ("Osgood"), of Noran Neurological Clinic, P.A., Taillefer reported fluctuating levels of back pain and episodes of unconsciousness and/or altered consciousness; some of these episodes occurred while he was driving a van. (*Id.* at 534–38). Dr. Golden and Osgood agreed that Taillefer "should no longer drive for work," and recommended an EEG. (*Id.* at 534, 535, 537–38). The ensuing EEG showed normal results. (*Id.* at 608). Dr. Golden asked Taillefer to undergo further evaluation and prescribed medication. (*Id.*).

On December 8, 2009, Taillefer saw Osgood. (*Id.* at 530). He reported lower back pain and stated that "his head drops and jerks" at times. (*Id.*). Taillefer had muscle spasms, tenderness, and range of motion limitations in his spine, as well as decreased sensation to pin

---

[1]     In 2007 Taillefer underwent a vocational evaluation. (*Id.* at 413–44). The evaluator concluded that "[b]ased on the observations during the evaluation, it was strongly suggested that [Taillefer] apply for social security disability income" due to his pain issues, fatigue, difficulty with recalling information, multitasking, dividing his attention, and stopping and starting work. (*Id.* at 443). Taillefer also became emotional and required "extra break[s] before he was able to continue on with a task," despite many accommodations provided during the evaluation. (*Id.*).

4

prick in the tip of one finger and in the outside of the lower left leg. (*Id.* at 531). His gait was normal, and he had a stable mood and affect. (*Id.*).

Taillefer was referred to Gordon Chatterton, DC ("Dr. Chatterton"), for chiropractic care. (*Id.* at 501). He saw Dr. Chatterton approximately ten times in 2009 and approximately fifteen times in 2010 before Taillefer's AOD. (*Id.* at 495–99). These appointments reflect various levels and sources of pain and various levels of improvement during Taillefer's treatment with Dr. Chatterton. *See, e.g.*, (*id.* at 496) (noting that Taillefer's neck was "better," but his back was stiff and painful at an October 12, 2009 appointment); (*id.* at 498) (noting lessening back pain at certain appointments, but noting "bad days," tightness in Taillefer's spine, and rigidity and tenderness at other appointments).[2]

Taillefer saw Osgood again on January 8, 2010, and reported feeling better "overall." (*Id.* at 527). He reported that he was promoted to supervisor at his Census Bureau job, which meant that he was "up and down more" and not using a computer as much, resulting in fewer migraines. (*Id.*). He reported "no episodes of head dropping and jerking." (*Id.*). Taillefer's motor exam was mostly normal. (*Id.*). His gait was antalgic, he had tenderness in various areas of his back, and he had decreased range of motion in the cervical spine. (*Id.*). Examination also revealed some abnormal jerking in Taillefer's eye movements. (*Id.*).

Dr. Golden saw Taillefer on June 1, 2010, for medication monitoring. (*Id.* at 602–03). Dr. Golden stated that Taillefer was still experiencing a "fair amount of leg pain and back pain" and that Taillefer's activities were limited, but that he was "managing his chronic problems

---

[2]     Taillefer's memorandum erroneously refers to Dr. Chatterton as "Dr. Casterton." (Mem. in Supp. of Pl.'s Mot. for Summ. J., "Taillefer's Mem. in Supp.") [Doc. No. 21 at 25]. In addition, the Court notes that the medical records submitted from Dr. Chatterton are difficult to read. *See* (Admin. R. at 495–500). The Court has reviewed the records to the extent possible in light of their quality. Moreover, Taillefer discusses Dr. Chatterton's treatment notes in his memorandum, and the Commissioner does not dispute his characterization of these records.

reasonably well." (*Id.* at 603); *see also* (*id.*) (stating that pain management is adequate but "not great"). Dr. Golden changed Taillefer's medication, as his current medication was not "managing his depression very well." (*Id.*).

### 2.    After September 5, 2010 (AOD), through March 31, 2011 (DLI)

On September 8, 2010, Taillefer presented to Lanny Law, DMin, LMFT ("Dr. Law"), for therapy. (*Id.* at 553). Taillefer reported having marital struggles, continued depression, anxiety, and interpersonal tension (*Id.*). Taillefer noted ongoing back, neck, and leg pain and also reported the end of his recent work with the Census Bureau, which he stated was "very hard for him to do" and which caused him to "often get[] physically ill." (*Id.* at 553, 555). When Taillefer saw Dr. Law he was neatly groomed, cooperative, alert, and had clear, relevant thought and perception, and normal speech. (*Id.* at 556). Taillefer also appeared anxious, depressed, and angry. (*Id.*) Taillefer reported a sixteen year history of depression, which led to low self-esteem, frustration, anger, irritation, sadness, feeling blue, sleep disturbance, fatigue, difficulty concentrating, and indecisiveness. (*Id.* at 557).

Dr. Law noted the intensity of Taillefer's depression as "moderate," but "sometimes severe or mild depending on psychosocial stressors." (*Id.* at 558). Dr. Law noted heightened intensity of Taillefer's symptoms due to the recent death of his father and issues relating to his wife's infidelity. (*Id.*). Dr. Law noted diagnoses under Axis I as "depression disorder not otherwise specified," "adjustment disorder with anxiety and depression," and "partner relationship problem," noted chronic pain under Axis II, noted economic and vocational problems under Axis IV, and assigned Taillefer a GAF score of 60.[3] (*Id.* at 559). On September

---

[3]    Diagnosis of mental disorders requires a multiaxial evaluation. Axis I refers to the individual's primary clinical disorders that will be the foci of treatment; Axis II refers to personality or developmental disorders; Axis III refers to general medical

16, 2010, and September 22, 2010, Taillefer saw Dr. Law. (*Id.* at 560–61). Taillefer appeared oriented, with a normal affect and mood at both appointments, but with some anxiety and depression at the latter appointment. (*Id.*).

From September 2010 to January 2011, Taillefer saw Dr. Chatteron for chiropractic care eight times. (*Id.* at 499–500). Dr. Chatterton often observed tightness and rigidity in Taillefer's back. (*Id.*). Dr. Chatterton also noted neck spasms and tenderness. (*Id.* at 500).

Taillefer saw Osgood on October 1, 2010, reporting left leg pain and numbness that was limiting his ability to bend and walk. (*Id.* at 523). He reported that if he used the computer or read "a lot," he would "get[] groggy and tired" and go "completely out" for one or two seconds. (*Id.*). Taillefer also reported that medication was helping his depression. (*Id.*). Taillefer's gait was slightly antalgic and he showed tenderness in several spinal areas. (*Id.* at 524). Range of motion in the cervical spine was moderately limited in each direction, and range of motion in the lumbar spine was mildly to moderately limited in flexion and extension. (*Id.*). Taillefer was able to heel and toe walk without difficulty. (*Id.*). Osgood recommended another MRI to determine whether Taillefer had worsening disc problems and recommended continued chiropractic care with Dr. Chatterton in the meantime. (*Id.*).

On October 4, 2010, Taillefer had an MRI of his lumbosacral spine. (*Id.* at 516). When comparing the results of this MRI to a December 20, 2007 examination, "there [were] no

conditions; Axis IV refers to psychosocial and environmental problems; and Axis V refers to the clinician's assessment of an individual's level of functioning.

*Carlson v. Astrue*, Civil No. 09-2547 (DWF/LIB), 2010 WL 5113808, at *16 n.3 (D. Minn. Nov. 8, 2010) (Brisbois, Mag. J.) (citation omitted), *adopted by* 2010 WL 5100785 (Dec. 9, 2010). At Axis V, clinicians use the GAF Scale, a scale of 0 to 100, to subjectively rate an adult client's psychological, social, and occupational or school functioning based on mental illness. *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")* 32 (American Psychiatric Assoc. 4th ed. 1994). Scores from 51 to 60 indicate "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning." *Id.*

significant interval change[s]." (*Id.*). The MRI showed no evidence of disc herniation or spinal stenosis. (*Id.*). There was no evidence of L3–4 nerve root impingement, though there was mild circumferential disc bulging with "marginal spurring" at this level. (*Id.*). There was decreased signal and narrowing of the T10–11 intervertebral disc. (*Id.*). There was no evidence of stenosis of the "central spinal canal or the neural foramina." (*Id.*). Examination at the L5–S1 level demonstrated no evidence of disc herniation or spinal stenosis; however, degenerative changes were present within the zygapophyseal joints.[4] (*Id.*).

On October 20, 2010, Taillefer saw Osgood to follow up regarding the results of his MRI. (*Id.* at 520). He reported continued left leg pain and numbness, interfering with his ability to walk. (*Id.*). He also reported continued low back pain, middle back pain, and neck pain, but reported that it was helpful to see his chiropractor every other week. (*Id.*). On examination, Taillefer was "alert, attentive, oriented and cooperative," and his "affect and mood appear[ed] stable." (*Id.*). Osgood observed some deficiencies in Taillefer's reflexes at his ankles and knees and noted minimally decreased strength in his hip flexor, but found "otherwise normal motor strength and tone in both" legs. (*Id.*). Osgood believed that Taillefer may be a good candidate for "lumbar medial branch blocks" and if those were helpful, recommended "radiofrequency ablation."[5] (*Id.* at 521).

On November 19, 2010, Taillefer saw David W. Spight, DO ("Dr. Spight"), at the request of Dr. Golden. (*Id.* at 550). He reported constant and worsening low back pain that was exacerbated by prolonged sitting, walking, and standing. (*Id.*). Taillefer reported relief from

---

[4]       "Zygapophyseal" means "relating to a zygapophysis or articular process of a vertebra (e.g. zygapophysial joints)." Stedman's Medical Dictionary, *Zygapophyseal* (28th ed. 2006).

[5]       "Radiofrequency" refers to "radiant energy of a certain frequency," while "ablation" refers to the "removal of a body part or the destruction of its function, as by a surgical procedure or morbid process, or the presence or application of a noxious substance." Stedman's Medical Dictionary, *Ablation*, *Radiofrequency* (28th ed. 2006).

"bending forward, resting, heat, ice, medications, and chiropractic [care]." (*Id.*). Dr. Spight noted previous treatment through physical therapy, chiropractic care, use of a TENS unit, massage, and epidural steroid injections. (*Id.*). Dr. Spight found Taillefer had a normal gait, and his gross motor examination was normal. (*Id.*). Taillefer's strength was normal and his sensation intact, but he showed some decreased range of motion and increased pain in his lumbar spine. (*Id.*). Dr. Spight reviewed Taillefer's recent MRI results and noted his impression as "[p]ost-traumatic chronic low back pain . . . with three level degenerative disc disease with annular tears and facet joint arthropathy," "[c]hronic neck pain . . . with subsequent mild disc degeneration at C5–6 without evidence of central canal or nerve root compression," "[p]ossible cervical facet joint mediated low back pain," and possible chronic pain syndrome. (*Id.* at 551). Dr. Spight recommended conducting bilateral medial branch blocks to help determine the source of Taillefer's lower back pain, and, if those were successful, he recommended radiofrequency dorsal rhizotomies.[6] (*Id.*).

Taillefer saw Dr. Law on November 23, 2010, and December 1, 2010. (*Id.* at 562–63). Taillefer reported ongoing depression and anxiety related to his wife leaving him and "various interpersonal stresses." (*Id.*). Taillefer also reported, however, that he was doing better and "beginning to heal." (*Id.* at 563). Taillefer was oriented, and his mood and affect were normal. (*Id.*). Dr. Law instructed Taillefer to continue individual counseling and engage in journaling. (*Id.*). Taillefer saw Dr. Law twice more in December 2010 and once in January 2011, where Taillefer continued to struggle with anxiety and depression related to his divorce, as well as continued physical pain. (*Id.* at 564–66). Dr. Law consistently noted Taillefer's affect as being normal, but his mood was often noted as "anxious" and "depress[ed]." (*Id.*).

---

[6]     "Dorsal" means "pertaining to the back" and "rhizotomy" refers to "section of the spinal nerve roots for the relief of pain or spastic paralysis." Stedman's Medical Dictionary, *Dorsal*, *Rhizotomy* (28th ed. 2006).

On December 14, 2010, and January 4, 2011, Taillefer underwent bilateral L3–5 medial branch blocks, performed by Dr. Spight. (*Id.* at 546–47). On January 28, 2011, Dr. Spight performed radiofrequency dorsal rhizotomies on the left L3–5 area of Taillefer's spine and, shortly thereafter, performed the same procedure on the right L3–5 area. (*Id.* at 544–45).

Taillefer saw Dr. Law twice in February 2011 and twice in March 2011. (*Id.* at 567–70). Dr. Law noted continued stressors and needs, including Taillefer's ongoing divorce, chronic physical pain, and economic uncertainty. (*Id.*). He also noted that Taillefer was worried about his pain medication not being as efficacious. (*Id.*). Dr. Law noted Taillefer's mood and affect as normal, though sometimes he also noted anxiety and depression. (*Id.*). Dr. Law continued to recommend individual therapy and journaling. (*Id.* at 567, 570).

Taillefer presented to Dr. Spight on March 4, 2011. (*Id.* at 549). He reported "good pain relief from his usual central lower back pain," but was still experiencing spasms on the left side of his lower back and in the area of the "left iliac crest." (*Id.*). In addition, he continued to have neck pain and pain in his upper and middle back. (*Id.*). Upon examination, Taillefer had some difficulty transitioning from a seated to standing position, but his gait was mostly normal. (*Id.*). Taillefer experienced some tenderness in his cervical spine. (*Id.*). Dr. Spight's impressions included mild cervical spondylosis with chronic neck pain. (*Id.*). Dr. Spight stated that Taillefer's back pain had significantly improved, but that this pain was not resolved after the radiofrequency dorsal rhizomtomies. (*Id.*). It was still too early to determine what benefit Taillefer may get from the procedures, so Dr. Spight recommended follow up. (*Id.*).

On March 18, 2011, Taillefer again saw Dr. Spight. (*Id.* at 548). He reported the same level of improvement since his last appointment, but "no additional improvement." (*Id.*). Taillefer continued to experience symptoms in his left leg that Dr. Spight believed to be

"emanating from his left sacroiliac joint." (*Id.*). Taillefer reported pain in his upper and middle back, but said his lower back pain was better and no longer constant. (*Id.*). Taillefer easily rose from a seated position and had full range of motion in his lumbar spine. (*Id.*). His gait was normal. (*Id.*). He had tenderness over his sacroiliac joints. (*Id.*).

### 3.    After March 31, 2011 (DLI)

Taillefer saw Dr. Golden on April 8, 2011. (*Id.* at 573). Dr. Golden noted that Taillefer continued to have pain aggravated by "walking any distance," and that his pain increased when Taillefer was in static positions or "straining." (*Id.*). Dr. Golden noted that OxyContin was providing Taillefer with "very little relief," and noted that Taillefer's updated medication regime was: "hydrocodone/acetaminophen . . . up to three times per day," Prevacid, Migranal, Flexeril, Valium (for severe muscle spasms), glucosamine, Benadryl, metoprolol, Lyrica, lisinopril, and Effexor. (*Id.*). Dr. Golden scheduled Taillefer for a thoracic MRI, and stated that Taillefer's "examination continues to be consistent with his degree of back pain with an antalgic gait, marked range of motion limitation throughout his spine with muscular spasms throughout." (*Id.*) Dr. Golden opined that Taillefer was "permanently [and] totally disabled." (*Id.*).

On April 11, 2011, Taillefer underwent an MRI of his thoracic spine, which revealed mild spondylosis at the T10–11 level. (*Id.* at 572). No "signal abnormality" was demonstrated within the thoracic spinal cord, and no evidence of disc herniation or spinal stenosis was observed. (*Id.*).

Taillefer saw Dr. Law twice in April 2011. (*Id.* at 706–07). At the first visit, Dr. Law noted Taillefer was doing better overall with a normal affect and mood. (*Id.* at 706). At the second visit, Dr. Law noted Taillefer's continued interpersonal struggles. (*Id.* at 707). Taillefer was depressed, anxious, and angry, but his affect was normal. (*Id.*). Taillefer also saw Dr. Law in

May and June 2011 and reported improvement in his ability to handle issues related to his divorce, as well as less depression and anxiety. (*Id.* at 708–09). Taillefer continued to see Dr. Law approximately twice a month for the remainder of 2011. (*Id.* at 710–22). Dr. Law helped Taillefer address anxiety and depression related to ongoing financial stressors, physical pain, and interpersonal struggles arising out of his divorce, with some noted improvement near the end of 2011. (*Id.*).

Dr. Spight reviewed Taillefer's thoracic MRI on May 9, 2011. (*Id.* at 638). He noted that there was "no nerve root encroachment or any central canal encroachment," normal alignment, and Taillefer's discs were "well hydrated with the exception of mild disc degeneration at T10–11." (*Id.*). Dr. Spight opined that the imaging did not explain Taillefer's symptoms of chronic lower thoracic pain, and believed that Taillefer's ongoing pain is "facet joint mediated." (*Id.*). Dr. Spight planned to discuss these impressions and potential diagnostic measures with Taillefer. (*Id.*).

Taillefer saw Osgood on July 28, 2011, regarding neck and back pain. (*Id.* at 695). Taillefer reported that Dr. Spight's recent treatment helped his lower back pain and that he was planning to undergo the same treatment in his thoracic spine when he was financially able. (*Id.*). He reported back muscle spasms and ongoing back and neck problems. (*Id.*). Taillefer complained of continued headaches, lightheadedness, difficulty concentrating, memory loss, and difficulty walking. (*Id.*). He told Osgood that he was "getting by" with use of hydrocodone, but was "not to the point of pain relief" and wanted "better pain management." (*Id.*). Upon examination, Taillefer's gait was antalgic; he leaned to the right and used a cane in his right hand. (*Id.* at 696). He had muscle spasms throughout his back, with tenderness in some areas. (*Id.*). Taillefer had decreased range of motion of the cervical and lumbar spine and "absent ankle

12

reflexes, but normal and symmetrical" reflexes in his knees and arms. (*Id.*). His sensation was decreased in "the fourth and fifth digits" on both hands, but he had normal sensation in his lower legs and thighs. (*Id.*). Osgood instructed Taillefer to continue to use Vicodin twice a day, but told him to substitute his third dose with "OxyContin for longer lasting relief." (*Id.*).

On November 21, 2011, Taillefer saw Kevin Bailey, MD ("Dr. Bailey"), regarding high blood pressure and musculoskeletal pain. (*Id.* at 654–57). Taillefer's lumbar spine was non-tender with mildly reduced range of motion, and his cervical spine was tender with mildly reduced range of motion. (*Id.* at 656). Dr. Bailey referred Taillefer to occupational therapy and suggested that Taillefer obtain pain medication from Dr. Golden. *See* (*id.* at 657).

On February 21, 2012, Taillefer saw Dr. Law. (*Id.* at 724). Worsening chronic pain and financial stress contributed to Taillefer's ongoing depression and anxiety. (*Id.*). Taillefer continued to see Dr. Law regarding these and similar issues throughout most of 2012. (*Id.* at 725, 726, 734–38).

Taillefer had an MRI of his thoracic spine on April 11, 2012. (*Id.* at 572). Mild spondylosis at the T10–11 level was noted. (*Id.*). Taillefer continued to struggle with chronic pain issues throughout the remainder of 2012, though the records from this time period suggest some improvement in his neck, leg, and back pain. *See, e.g.*, (*id.* at 741) (emergency room visit regarding left leg pain); (*id.* at 864) (noting chronic back pain); *but see* (*id.* at 786) (physical examination showing that Taillefer's neck was "supple" with normal range of motion and that Taillefer had "no edema" or tenderness with regard to the musculoskeletal system). Taillefer also experienced other health issues in 2012, including hypertriglyceridemia-induced pancreatitis, acute renal failure related to dehydration, gallstones and/or sludge in the gallbladder, and a diagnosis of diabetes. (*Id.* at 747–84); *see also* (*id.* at 785–1005).

13

### D.      Opinion Evidence from Treating Sources

#### 1.      Dr. Law

On July 9, 2012, Dr. Law completed a mental residual functional capacity ("RFC") assessment. (*Id.* at 729–31). Dr. Law opined that Taillefer's ability to understand, remember, and carry out very short and simple instructions and ability to ask simple questions or request assistance were not significantly limited. (*Id.* at 729–30). He opined, however, that Taillefer's ability to understand, remember, and carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule and maintain regular and punctual attendance, ability to complete a normal work day and week without interruptions from psychologically based symptoms, ability to perform at a consistent pace without an unreasonable number and length of rest periods, ability to accept instructions and respond appropriately to criticism from supervisors, and ability to respond appropriately to changes in the work setting and travel in unfamiliar places were markedly limited. (*Id.* at 729–31). He further opined that Taillefer was moderately limited in several other areas of functioning. (*Id.*). Dr. Law's treatment note for July 9, 2012, states that he "worked through [the] mental [RFC] form" with Taillefer. (*Id.* at 737).

#### 2.      Dr. Chatterton

Dr. Chatterton completed a "Physical Capacities Evaluation" for Taillefer on December 14, 2011. (*Id.* at 680–84). The first page of the evaluation states in bold: "Evaluation of patient's abilities on or before 3/31/2011"—Taillefer's DLI. (*Id.* at 680). Dr. Chatterton opined that, in an eight-hour work day, Taillefer could sit for one hour, stand/walk for less than one hour, and would need an opportunity to alternate between sitting and standing throughout the day. (*Id.*). Dr. Chatterton opined that Taillefer could not use his right hand for fine manipulation, but stated that

Taillefer could use both hands for grasping, pushing, pulling, and "repetitive motion tasks." (*Id.*). Dr. Chatterton further opined that Taillefer could frequently lift up to five pounds and occasionally lift between six and twenty pounds, but never twenty-one to one hundred pounds. (*Id.* at 681).

Dr. Chatteron opined that Taillefer could never climb, balance, crawl, or reach above shoulder level, but could occasionally stoop, kneel, and crouch. (*Id.*). Taillefer also required several environmental restrictions. (*Id.*). Dr. Chatteron stated that Taillefer suffered from fatigue and noted the "reasonable medical basis" for his fatigue as "work related injuries of 12/29/94 including injuries to the brain and spine." (*Id.* at 682). In addition, Dr. Chatterton noted Taillefer's ongoing pain and cited the 1994 work-related injuries as the reasonable medical basis for this pain. (*Id.* at 683). He also noted "vertebral distortions . . . on x-ray films." (*Id.*). Dr. Chatterton opined that Taillefer's fatigue and pain were disabling to the extent that they would each prevent Taillefer from working full time, even at a sedentary position. (*Id.* at 682–83). Finally, Dr. Chatterton noted that Taillefer's pain and/or side effects of medication would have a moderate effect on his attention and concentration, meaning "a significant handicap with sustained attention and concentration [that] would eliminate skilled work tasks." (*Id.* at 684).

At various points in his evaluation, Dr. Chatterton affirmed that he was aware that Taillefer was insured for social security coverage through March 31, 2011, and affirmed that his assessment represented Taillefer's abilities on or before that date. (*Id.* at 681–84). He also stated that his assessment reflected Taillefer's current functioning. (*Id.*).

### 3.      Dr. Golden

In a letter dated April 8, 2011, Dr. Golden noted that Taillefer had been under the care of Noran Neurological Clinic, P.A., "since the early 1990s" and had been "a very compliant and

straightforward" patient. (*Id.* at 576). Dr. Golden noted that Taillefer had been treated for thoracic disc herniation, lumbar disc herniation, lumbar radiculopathy, cervical radiculopathy, insomnia, and "a problem with excessive daytime sleepiness." (*Id.*). He stated that Taillefer had to take medications to keep him in a "reasonably functional condition," which "prevent[s] him from doing the work he is trained to do." (*Id.*). Dr. Golden also stated that Taillefer has "multiple complicating problems" that become "substantially worse with regimented environments." (*Id.*). Dr. Golden opined that Taillefer is "permanently and totally disabled due to the injuries he suffered, as well as the chronic problems he lives with." (*Id.*).

Additionally, Dr. Golden completed a questionnaire on January 23, 2012. (*Id.* at 687–93). He noted Taillefer's ongoing pain, citing "thoracic spondylosis," "lumbar disc and joint degeneration," and "cervical degeneration" as the medical basis for this pain, and opined that the pain was disabling to the extent it would prevent Taillefer from working full time, even in a sedentary position. (*Id.* at 687). Dr. Golden opined that the pain and/or side effects of medication moderately affect Taillefer's attention and concentration. (*Id.* at 688). In addition, Dr. Golden opined that Taillefer suffered from memory impairment and disturbances in mood and that Taillefer had moderate restrictions in his activities of daily living, moderate deficiencies in concentration, persistence and pace, and had suffered four or more repeated episodes of decompensation, each of extended duration. (*Id.* at 689–90).

According to Dr. Golden, Taillefer's ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be "punctual within customary tolerances" were markedly limited. (*Id.* at 692). Dr. Golden opined that Taillefer's ability to work in coordination with or proximity to others without being distracted by them, ability to complete a normal work day and work week

without interruptions from psychologically based symptoms, and ability to perform at a consistent pace without an unreasonable number and length of rest periods were also markedly limited. (*Id.*). He found moderate limitations in other areas, but found no significant limitations in the areas of social interaction or adaptation. (*Id.* at 692–94). At various points in his evaluation, Dr. Golden affirmed that he was aware that Taillefer was insured for social security coverage through March 31, 2011, and affirmed that his assessment represented Taillefer's abilities on or before that date. (*Id.* at 687–88, 690–91, 694). He also stated that his assessment reflected Taillefer's current functioning. (*Id.*).

### E.    Psychological Consultative Examination

Two months after Taillefer's DLI, on May 31, 2011, Donald E. Wiger, PhD, LP ("Dr. Wiger"), saw Taillefer for a psychological consultative examination. (*Id.* at 646). Taillefer told Dr. Wiger about his work place accident in 1994 and stated that he has back pain, "some memory problems," and takes medication for depression. (*Id.*). Dr. Wiger noted Taillefer's medications as "Effexor, Lyrica, Metoprolol, Lisinopril, Glucosamine, Hydrocodone, Flexaril, Valium, and Midrin," and noted that Taillefer sees Dr. Law for counseling every other week, which Taillefer finds helpful. (*Id.*). Taillefer told Dr. Wiger he cooked dinner, was able to dress, bathe, and groom himself, drove, watched television, played in a band once a month, and was able to do chores such as "laundry, sweeping, and vacuuming." (*Id.* at 647). He reported, however, that doing "chores for longer periods of time" is difficult. (*Id.*). Taillefer stated that he gets along with the other people in his band. (*Id.*). Taillefer reported his pain as being between a three and five out of ten in the mornings, and said that his ability to sleep varies. (*Id.*).

Dr. Wiger conducted a mental status examination. (*Id.*). Taillefer appeared relaxed, alert, cooperative, and attentive, and his speech was understandable. (*Id.*). His affect was normal in

range and appropriate, and he "did not appear to be depressed, anxious, irritable, or angry." (*Id.*). Taillefer told Dr. Wiger, "I'm doing pretty good . . . I'm sometimes down," but "denied any impairing areas of anger management, panic attacks, anxiety, depression, mania, or PTSD." (*Id.*). Taillefer did not endorse symptoms of depression at the time of the exam. (*Id.* at 648).

Taillefer followed Dr. Wiger's directions, understood questions, and was not easily distracted. (*Id.*). He recalled three out of three words immediately and after five and thirty minutes, but stated that his memory varies. (*Id.*). Testing showed that Taillefer's full scale IQ is 89, which is in the low-average range. (*Id.* at 649). Taillefer's lowest score was in processing speed, and his processing speed and memory scores were "in the borderline range," which raised concerns regarding "concentration and executive functioning." (*Id.*). Other testing showed "memory indices" in the "average to low-average range." (*Id.*). Dr. Wiger did not find any current evidence of a depressive disorder, but noted previous diagnoses of "Depression NOS" and assigned Taillefer a GAF score of 58. (*Id.* at 649–50). Dr. Wiger opined that Taillefer is able to understand directions, "carry out mental tasks with reasonable persistence and pace," handle work place stressors, and respond appropriately to others. (*Id.* at 650).

### F.    Non-Examining Consultative Opinions

State agency medical consultant Richard Hadden, MD ("Dr. Hadden"), completed an RFC assessment on June 15, 2011. (*Id.* at 90–94). He opined that Taillefer could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for six hours in an eight-hour work day, and sit for six hours in an eight-hour work day. (*Id.* at 91). Dr. Hadden also found various postural and manipulative limitations. (*Id.* at 91–92). He concluded that Taillefer could engage in

his past relevant work as a van driver. (*Id.* at 93). On October 11, 2011, Cliff Phibbs, MD ("Dr. Phibbs"), affirmed Dr. Hadden's opinion. (*Id.* at 107).

State agency psychological consultant James M. Alsdurf, PhD, LP ("Dr. Alsdurf"), opined on June 15, 2011, that Taillefer had a medically determinable impairment, which he identified as an "affective disorder[]," but found the impairment non-severe. (*Id.* at 89). He opined that Taillefer had mild limitations in activities of daily living, social functioning, and in maintaining concentration, persistence, and pace. (*Id.*). Dr. Alsdurf noted that Taillefer did not endorse symptoms of mental illness during his consultative examination with Dr. Wiger and found Taillefer's allegations regarding his symptoms and their effects to be only partially credible. (*Id.* at 90). Russell Ludeke, PhD, LP ("Dr. Ludeke"), affirmed Dr. Alsdurf's opinion on October 11, 2011. (*Id.* at 101–02).

## G.      Vocational Expert Testimony

 Brett Salkin testified as a vocational expert ("VE") at the hearing before the ALJ. (*Id.* at 60). The VE identified three of Taillefer's past jobs. (*Id.* at 61–67). This included Taillefer's past employment as: (1) a van driver, which is listed as involving medium physical demands; (2) a break press or mill operator, which is also listed as involving medium physical demands; and (3) a field office manager, which was treated as light work.[7] (*Id.* at 62–67). The ALJ then asked the VE the following hypothetical question:

> [A]ssuming somebody of the claimant's age, education and work experience who is able to perform work at a light level; lifting up to [twenty] pounds occasionally, up to ten pounds frequently; standing and/or walking for up to six hours and sitting for up to six hours in an eight hour workday with normal breaks; frequently climbing ramps and stairs; but, never climbing ladders, ropes or scaffolds;

---

[7]      The VE and the ALJ discussed how to classify Taillefer's field office manager job, as there is no field office manager job listed in the Dictionary of Occupational Titles ("DOT"). (*Id.* at 63–67). The VE testified that the position listed as administrative clerk was the best classification for this job. (*Id.* at 66–67). Given the classification as administrative clerk, the field office manager position was defined as light work. (*Id.*).

> frequently balancing, stooping, kneeling; occasionally crouching and crawling;
> limited to occasional reaching overhead with the bilateral upper extremities;
> avoiding concentrated exposure to fumes, odors, dusts, gasses and poorly
> ventilated areas . . .; [a]voiding all exposure to hazardous machinery [and]
> unprotected heights. . . . [C]an you give me unskilled jobs[?]

(*Id.* at 67–68). The VE answered that the hypothetical individual would be capable of performing

the unskilled jobs of sales attendant, fast food worker, and cashier. (*Id.* at 68–69).

The ALJ posed a second hypothetical consisting of the "same [limitations] as the first,

except it's going to be . . . sedentary; lifting up to ten pounds occasionally; standing . . . and/or

walking for up to two hours and sitting for up to six hours in an eight hour workday with normal

breaks." (*Id.* at 69). The VE gave examples of unskilled, sedentary jobs that this individual could

perform, including food and beverage order clerk, bench assembler, and charge account clerk.

(*Id.*).

The ALJ then asked the VE to consider both of the ALJ's earlier hypotheticals with

additional limitations. (*Id.*). He added that the hypothetical person would be limited to

> noncomplex tasks, such as . . . tasks that do not require more than rudimentary
> reading, such as safety words, [including] on, off, stop, go, enter, exit; which can
> be learned by observation or demonstration; and which can be learned within 30
> days. And then we're also limited to low stress tasks, meaning tasks that do not
> require high production quotas and strict time requirements, work that's paid at a
> piece rate, arbitration, negotiation, confrontation, directing the work of others or
> being responsible for the safety of others.

(*Id.* at 70). The VE responded to this hypothetical by stating that, given the further limitations, a

person limited to sedentary work would no longer be able to perform the bench assembler

position. (*Id.* at 71). The other positions that the VE testified to earlier with regard to the

respective exertional levels, however, would remain available to the hypothetical person. (*Id.*).

Taillefer's representative questioned the VE and asked if his testimony that someone

limited to sedentary work with the ALJ's proposed limitations would be able to perform the jobs

the VE provided because they "have SVP 2" and "really with the judge's hypothetical [the VE's] answer should have been only SVP 1 jobs."[8] (*Id.* at 74); *see also* (*id.* at 75–76). Taillefer's representative eventually identified the conflict between the VE's testimony and the DOT as being based on the ALJ's inclusion of "rudimentary reading" and "learned by observation or demonstration" limitations and stated that if these were removed, "you're at SVP 2 jobs." (*Id.* at 75–77). The representative suggested that rudimentary reading and learned by observation or demonstration limitations would conflict with "the reasoning, math and language" requirements for SVP 2 jobs.[9] (*Id.* at 74–76).

The ALJ modified his hypothetical by removing the non-exertional limitation of rudimentary reading, instead providing that the hypothetical individual would be limited to "noncomplex tasks, which are jobs that can be learned . . . by either observation or demonstration, which can be learned within 30 days." (*Id.* at 75). The ALJ asked the VE if this hypothetical would allow for SVP 1 and 2 jobs. (*Id.*). The VE said that it would and stated that the individual would still be able to perform the jobs he listed earlier. (*Id.*). Taillefer's representative continued to dispute the accuracy of the VE's testimony. (*Id.*).

### H.   The ALJ's Decision

---

[8]     Specific Vocational Preparation or "SVP" refers to "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, *App. C: Components of the Definition Trailer*, Part II, *available at* http://www.occupationalinfo.org/appendxc_1.html. SVP 1 reflects jobs that require "short demonstration only" and SVP 2 jobs involve "anything beyond short demonstration up to and including 1 month." *Id.*

[9]     The representative's reference to reasoning, math, and language requirements is a reference to "General Educational Development" or "GED" levels used in the DOT. DOT, *App. C: Components of the Definition Trailer*, Part III. GED requirements "embrace[] those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." *Id.* "This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study." *Id.*

On March 14, 2013, the ALJ issued a decision, concluding that Taillefer was not under a disability from the AOD through the DLI. (Admin. R. at 21). The ALJ's decision followed the five-step eligibility analysis. (*Id.* at 12–13); *see* 20 C.F.R. § 404.1520(a)–(g).

First, the ALJ found that Taillefer met the insured status requirements of the Social Security Act through March 31, 2011, and that Taillefer had not engaged in substantial gainful activity from the AOD through the DLI. (Admin. R. at 14). Next, the ALJ determined that Taillefer had the following severe impairments: "disorder of the back – including thoracic spondylolthesis, lumbar disc and joint degeneration, cervical degeneration, and thoracic and lumbar disc herniation; status post traumatic brain injury – cognitive disorder; osteoarthritis; headaches; high blood pressure; depression; and asthma." (*Id.*).

At the third step, the ALJ determined that Taillefer's impairments or combination of impairments did not meet or medically equal one of the Listings. (*Id.*). The ALJ found that Taillefer's mental impairments did not meet the "paragraph B" criteria in Listings 12.02 or 12.04 because Taillefer had only mild restrictions in activities of daily living, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (*Id.* at 15). The ALJ noted that Taillefer cooked, performed some household chores, ran errands, handled finances, shopped "both in stores and by computer," and drove and rode in vehicles. (*Id.*). The ALJ also noted Taillefer's testimony that he has problems with following instructions, handling stress, and dealing with changes in routine (*Id.*). Further, Taillefer stated that he generally tries to avoid people. (*Id.*). The ALJ also found that "the evidence fail[ed] to establish the presence of the paragraph C criteria." (*Id.*).

The ALJ also analyzed Taillefer's physical impairments. He noted that "the severity of [Taillefer's] physical impairments or combination of impairments does not meet or medically equal the severity required by any section or subsection of any of the Listings." (*Id.* at 14). The ALJ considered Listing 1.02 (major dysfunction of joints), Listing 1.04 (disorders of the spine), Listing 3.03 (asthma), and Listing 11.18 (cerebral trauma). (*Id.*).

Next, the ALJ analyzed Taillefer's RFC and found that he had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and meaning lifting up to twenty pounds occasionally and up to ten pounds frequently, standing and/or walking up to six hours and sitting for up to six hours in an eight hour workday, with normal breaks. Frequently climbing ramps and stairs; never climbing ladders, ropes or scaffolds. Frequently balancing, stooping, kneeling, occasionally crouching and crawling. Limited to occasional reaching overhead with bilateral upper extremities. Avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas. Avoid all exposure to hazardous machinery and unprotected heights. Limited to non-complex tasks, such as tasks that can be learned by observation or demonstration, and which can be learned within thirty days. Limited to low stress tasks, such as tasks that do not require high production quotas, strict time requirements, work that is paid at a piece rate, arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others.

(*Id.* at 16).

The ALJ stated that he considered the evidence of record and found that Taillefer's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Taillefer's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.* at 16–18). The ALJ discussed objective medical evidence, Taillefer's activities of daily living, as well as Taillefer's use of medications and other treatments. (*Id.* at 17–18). The ALJ also noted that Taillefer was receiving unemployment benefits during the third and fourth quarters of 2010, the first, third, and fourth quarters of 2011, and the first quarter of 2012, which contradicts his statement that he was only able to work on a part-time basis. (*Id.* at 18). The receipt of these benefits suggested that

Taillefer was willing and able to work on a full-time basis, and was actively seeking to work during this period. (*Id.*).

The ALJ also considered opinion evidence. The ALJ assigned significant weight to the opinions of Dr. Hadden and Dr. Phibbs, the state agency medical consultants, because they have specialized knowledge in evaluating medical impairments and the Social Security Administration's disability standards, the opinions were "consistent with the record as a whole," and because they were "not contradicted by any treating source." (*Id.*). The ALJ gave "less weight" to Dr. Alsdurf and Dr. Ludeke, the state agency psychological consultants, "because even though the evidence mostly supports their opinions, . . . the evidence received at the hearing level" demonstrated that Taillefer has a "severe mental impairment." (*Id.* at 19). The ALJ gave significant weight to the opinions of Dr. Wiger based on his 2011 consultative examination and the opinions offered in a 2004 consultative examination report because, "even though these opinions were rendered outside the appropriate time period of this case, they are generally consistent with the record in this case."[10] (*Id.*).

Next, the ALJ gave "less weight" to the opinions of Dr. Golden and Dr. Law, which the ALJ stated "were rendered outside the appropriate time period of this case." (*Id.*). The ALJ stated that Dr. Golden's opinion was conclusory and "not supported by the entirety of the medical evidence of record." (*Id.*). The ALJ also noted an April 2011 opinion from Dr. Golden and stated that the opinion was "not supported by medical evidence," evidence regarding Taillefer's activities of daily living, "or his ability to function and work" and was an opinion "reserved for the Commissioner." (*Id.*). With regard to Dr. Law, the ALJ stated that his opinion "appears to be based on [Taillefer's] subjective complaints and is not supported by the record of [Taillefer's]

---

[10]    Because Taillefer does not address the ALJ's treatment of the 2004 consultative examiner's opinions, the Court does not address this opinion in detail in this Report and Recommendation. *See generally* (Taillefer's Mem. in Supp.).

ability to function in activities of daily living." (*Id.*). The ALJ also gave less weight to the opinion of Taillefer's spouse, Julie Taillefer, because she is not an acceptable medical source and her relationship with Taillefer is "personal and subjective rather than professional and objective." (*Id.*).

At step four, the ALJ found that, through the DLI, Taillefer was unable to perform his past relevant work. (*Id.* at 19–20). The ALJ then continued to step five. (*Id.* at 20). The ALJ noted that Taillefer was a younger individual on the DLI, could communicate in English, and had a high school education. (*Id.* at 20); *see also* 20 C.F.R. §§ 404.1563, 404.1564. The ALJ found that, given Taillefer's RFC, there were other "jobs that existed in significant numbers in the national economy that [Taillefer] could have performed." (Admin. R. at 20). These jobs were sales attendant, fast food worker, and cashier. (*Id.* at 21). The ALJ determined that the vocational expert's testimony was consistent with the information contained in the DOT. (*Id.*). Consequently, the ALJ held that Taillefer was not disabled as defined in the Social Security Act from the AOD through the DLI. (*Id.* at 21).

## II.    STANDARD OF REVIEW

"The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992) (citing 42 U.S.C. § 1382(a)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. *Id.* § 405(g). The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)). The Court's task is limited "to review[ing] the record for legal error and . . . ensur[ing] that the factual findings are supported by substantial evidence." *Id.*

The substantial evidence standard does not require a preponderance of the evidence, but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). But this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (quoting *Jackson v. Bowen*, 873 F.2d 1111, 1113 (8th Cir. 1989)).

> Substantial evidence is merely such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Substantial evidence on the record as a whole, however, requires a more scrutinizing analysis. In the review of an administrative decision, [t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (alteration in original) (citation and internal quotation marks omitted).

## III.   DISCUSSION

Taillefer challenges the ALJ's decision on several grounds. First, Taillefer argues that the ALJ's RFC assessment was incorrect because he failed to give Taillefer's treating sources

appropriate weight and failed to address the opinions of Dr. Chatterton. (Taillefer's Mem. in Supp. at 22–28). Taillefer also argues that the ALJ gave improper weight to the opinions of state agency consultants and the consultative examiner, Dr. Wiger, and improperly relied on the ALJ's own opinions and inferences. (*Id.*). Third, Taillefer suggests that the ALJ failed to consider the combined limiting effects of his mental and physical impairments. (*Id.* at 28). Fourth, Taillefer argues that the ALJ improperly rejected the opinions of Julie Taillefer. (*Id.* at 28, 32). Fifth, Taillefer argues that the ALJ's finding that Taillefer was not credible is not supported by substantial evidence in the record. (*Id.* at 28–32). Finally, Taillefer argues that the ALJ erred in concluding that Taillefer can perform other work at step five of the sequential process because: (1) the hypothetical given to the VE did not accurately reflect Taillefer's limitations, and (2) the VE's testimony was inconsistent with the DOT and the ALJ failed to address the conflict. (*Id.* at 32–33).[11]

### A.    Opinion Evidence

#### 1.    Legal Standard

Generally, a treating source's opinion is given more weight than other sources in a disability proceeding. 20 C.F.R. § 404.1527(c)(2). When supported by proper medical testing, and not inconsistent with other substantial evidence of record, the ALJ will give such an opinion controlling weight. *Id.* "However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (alteration in

---

[11]    Early in his memorandum, Taillefer states that he "asserts that the ALJ was incorrect in his assessment of severe impairments at step 2" of the sequential process, but nothing in the remainder of his memorandum addresses step two of the ALJ's analysis. *See generally* (Taillefer's Mem. in Supp.). The Court therefore cannot address any assertion of error at step two.

original) (internal quotation marks omitted) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).

Even when a treating source's opinion is not given controlling weight, the ALJ must evaluate other factors to determine the weight it should be given. 20 C.F.R. § 404.1527(c). These factors include: (1) the length of the treatment relationship; (2) the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the degree to which the medical source supports the opinion; (5) the specialization of the source in the area addressed by the opinion; (6) the consistency of the opinion with the record as a whole; and (7) other factors deemed to support the opinion, including "the amount of understanding of [the Social Security Administration's] disability programs and their evidentiary requirements" that the source has. *Id.* § 404.1527(c)(2)–(6). These factors apply to the consideration of "any medical opinion," including medical opinions provided by consultative or non-examining medical sources. *See id.* § 404.1527(c), (e).

The above sections of the Code of Federal Regulations address the consideration medical opinions from physicians, psychologists, or other "acceptable medical sources." *Id.* § 404.1527(a)(2). Only "acceptable medical sources" can offer "medical opinions," and they are the only treating sources whose opinions may be entitled to controlling weight. *See id.* § 404.1527. Evidence from "other sources," however, may be considered to show the severity of the impairment or how it affects the individual's ability to function. *Id.* § 404.1513(d). Social Security Ruling 06-03p addresses the consideration of opinions from individuals who are not "acceptable medical sources," including other medical sources. *Titles II & XVI: Considering Opinions & Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental &*

*Nongovernmental Agencies*, SSR 06-03p, 71 Fed. Reg. 45593-03, 45593 (Aug. 9, 2006). It provides that the "same factors" that apply when considering the weight to afford the opinion of an acceptable medical source apply when considering the weight to afford opinion evidence from other medical sources. *Id.* at 45595 (noting that the relevant factors "represent basic principles that apply to the consideration of all opinions from medical sources" even when they are not acceptable medical sources for purposes of the social security regulations). A chiropractor is an "other medical source." *Id.* at 45594.

Opinions from such medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at 45595. In addition, opinions from other medical sources "may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* "Although there is a distinction between what the [AJL] must consider and what the [ALJ] must explain in the . . . decision, the [ALJ] generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case. *Id.* at 45596.

### 2. Analysis

Taillefer argues that the ALJ failed to properly weigh opinions offered by various medical sources. (Taillefer's Mem. in Supp. at 23–28). Specifically, Taillefer contends that the ALJ erred by failing to assign appropriate weight to the opinions of his treating physician, Dr. Golden, by relying on improper reasons to assign significant weight to the opinions of state

agency consultants, by failing to address the opinions of his chiropractor, Dr. Chatterton, and by failing to assign appropriate weight to the opinions of Dr. Law and consultative examiner Dr. Wiger. (*Id.*). The Court first addresses the ALJ's treatment of Dr. Chatterton's opinions, and concludes that remand is warranted on this ground.

Taillefer concedes that as a chiropractor, Dr. Chatterton is not an acceptable medical source who can offer a medical opinion entitled to controlling weight. 71 Fed. Reg. 45593-03, 45594; *see* 20 C.F.R. § 404.1527; (Taillefer's Mem. in Supp. at 26). Nonetheless, opinions from other medical sources, such as Dr. Chatterton, are important and an ALJ should "explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." 71 Fed. Reg. 45593-03, 45596.

Here, nothing in the ALJ's decision demonstrates that he considered Dr. Chatterton's opinions. *See* (Admin. R. at 18–19). Specifically, while the ALJ cited to Dr. Chatterton's opinion at one point, he did so in the course of stating that several exhibits—including Dr. Chatterton's opinions—"are dated outside of the adjudication period" and that those records therefore "do not impact [the ALJ's] decision unless the undersigned would make assumptions about the claimant's condition during the adjudication period based on these later findings and opinions." (*Id.* at 18). At least with regard to Dr. Chatterton's opinions, however, the record is inconsistent with the ALJ's statement.

The top of the first page of Dr. Chatterton's assessment states: "Evaluation of patient's abilities on or before 3/31/2011," and the bottom of the pages that follow state: "I am aware this patient was insured for social security coverage through 3/31/2011. **I affirm that this**

**assessment represents his/her abilities on or before 3/31/2011**." (*Id.* at 680–84) (emphasis added). This statement is followed by Dr. Chatterton's signature. (*Id.* at 681–84). While Dr. Chatterton stated that "in addition" his assessment reflected Taillefer's "current functioning," the above language and Dr. Chatterton's signature affirming the scope of his opinion demonstrates that Dr. Chatterton was opining as to Taillefer's abilities on or before the DLI. *See* (*id.*). The Commissioner's arguments to the contrary are unavailing and inconsistent with the explicit language of the form that Dr. Chatterton completed. *See* (Def.'s Mem. in Supp. of Mot. for Summ. J., "Def.'s Mem. in Supp.") [Doc. No. 23 at 10]. Thus, the ALJ's opinion demonstrates that, based on an incorrect understanding of the time period about which Dr. Chatterton was opining, the ALJ believed the opinion could have no impact on his decision as it would require him to make "assumptions" about Taillefer's condition during the relevant time period. (Admin. R. at 18). The Court notes that the ALJ actually went on to expressly consider the other evidence that he identified as dated outside the relevant time period, despite his previous statement that such evidence "d[id] not impact [the ALJ's] decision unless [he] would make assumptions about the claimant's condition during the adjudication period based on these later findings and opinions." (*Id.* at 17–19). Importantly, however, the ALJ did not go on to consider Dr. Chatterton's opinion.[12] *See* (*id.*).

 In addition, the ALJ's consideration of Dr. Chatterton's opinions may have had an effect on the outcome of the case. 71 Fed. Reg. 45593-03, 45596; *see also Nelson v. Astrue*, Civil No.

---

[12]   The Court notes that the Eighth Circuit has made inconsistent statements about "whether medical evidence concerning a claimant's condition at a later time is probative of her condition during the period of insured status." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007). The parties have not identified this inconsistency in the applicable circuit law or asked the Court to resolve it, nor has either party argued that the ALJ's consideration of evidence after the DLI was, by itself, error. Moreover, the Court need not resolve this inconsistency because, as explained above, Dr. Chatterton opined as to Taillefer's condition on or before Taillefer's DLI, not just his condition "at a later time." *See id.*; (Admin. R. at 680–84).

11-03346 (DWF/FLN), 2012 WL 7761489, at *13–14 (D. Minn. Dec. 12, 2012) (Noel, Mag. J.), *adopted by* 2013 WL 1104265 (Mar. 18, 2013). Dr. Chatterton treated Taillefer approximately twice a month throughout most of the adjudication period, frequently noted rigidity and tightness in various portions of Taillefer's spine, and noted tenderness in Taillefer's low back. (Admin. R. at 499–500) (noting "dorsals rigid" on September 27, 2010, "low b[ac]k tender" on November 16, 2010, and "L4 & 5 rigid, C1 & 2 rigid" on January 24, 2011).

Also, Dr. Chatterton was the only source who both treated Taillefer and provided function by function opinions regarding Taillefer's physical limitations, including limitations regarding his ability to sit, stand, and walk. *See* (*id.* at 680–81). Several of Dr. Chatterton's restrictions were more limiting than those the ALJ included in his RFC, and the VE's testimony suggests that such limitations would prevent Taillefer from performing other work. *See* (*id.* at 16) (ALJ's RFC determination providing that Taillefer is able to stand and/or walk up to six hours and sit for up to six hours in an eight-hour work day); (*id.* at 680) (Dr. Chatterton's opinion that Taillefer could stand and/or walk for less than one hour and sit for only one hour in an eight-hour work day); (*id.* at 67–71) (VE's testimony regarding Taillefer's ability to perform work at light level involving standing and/or walking for up to six hours and sitting up to six hours in an eight-hour work day and testifying regarding Taillefer's ability to do sedentary work involving standing and/or walking for up to two hours and sitting for up to six hours). "Because [Dr. Chatterton's] observations were potentially dispositive of [Taillefer's] claim the ALJ should have provided a comprehensive explanation as to how . . . [his] opinion was weighed and factored into [Taillefer's] RFC." *See Nelson*, 2012 WL 7761489, at *14 (finding error where ALJ provided inadequate and unclear reasons for assigning little weight to the opinion of other

medical sources).[13]

The Commissioner contends that any failure by the ALJ to consider Dr. Chatterton's opinion does not constitute error because: (1) the opinion is a conclusory "checkbox form that he completed with no explanation as to the medical basis for his opinion"; (2) Dr. Chatterton's opinion that Taillefer's "accident in 1994 caused fatigue" is inconsistent with the fact that Taillefer performed "medium work through 2001"; and (3) an ALJ is only "generally" required to explain the weight given to other medical sources. (Def.'s Mem. in Supp. at 10–11). The Court is not persuaded.

The assessment completed by Dr. Chatterton was in some respects a check-the-box form, but the Commissioner fails to acknowledge that Dr. Chatterton noted "spinal vertebral distortions" to support his opinion. (Admin. R. at 682–83). In addition, the Eighth Circuit has stated that an opinion should not be rejected as conclusory when what might be considered a conclusory opinion is "only one part of a larger medical record" that supports the opinion. *See Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003); *see also Brown v. Astrue*, 611 F.3d 941, 953 (8th Cir. 2010). Here, the ALJ did not consider or address Dr. Chatterton's opinion at all, let alone consider whether the opinion was consistent with the larger medical record, which includes

---

[13]     *See also Neeson v. Colvin*, No. 2:12-cv-51, 2013 WL 5442911, at *11 (E.D. Mo. Sept. 30, 2013) (reasoning that "[i]t is clear that consideration of [other medical source's opinion] may have had an effect on the outcome of the case" when opinion included "limitations not reflected in the RFC assessed by the ALJ" and when the other medical source treated claimant frequently and "was the only examining or treating source who offered any opinion regarding his mental abilities"); *Taylor v. Astrue*, 899 F. Supp. 2d 83, 88–90 (D. Mass. 2012) (finding error where ALJ failed to sufficiently explain his treatment of opinion of other medical source and noting that the "inadequate evaluation . . . may have affected the outcome of the case" based in part on the fact that other medical source saw claimant on a regular basis and noting that "had the ALJ properly evaluated [the] opinion, he may have given it more weight than the other medical evidence and may have reached a different conclusion").

Dr. Chatterton's treatment notes.[14] Likewise, while the Commissioner suggests that Dr. Chatterton's opinion that Taillefer's fatigue was related to injuries suffered in his 1994 work place accident is undermined by the fact that Taillefer performed "medium work through 2001," the ALJ did not rely on this as a basis to assign little weight to Dr. Chatterton's opinion. Again, the ALJ did not consider or address the opinion at all. *See* (Admin. R. at 18–19). That is, the Commissioner's arguments may ultimately support a finding that Dr. Chatterton's opinion is entitled to little weight, but here, there is no such finding for the Court to evaluate. This Court's role is "to review the record for legal error and to ensure that the factual findings are supported by substantial evidence," not to "reweigh the evidence or review the factual record de novo." *Hensley*, 352 F.3d at 355; *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (internal quotation marks omitted); *see also Nelson,* 2012 WL 7761489, at *14 ("In regard to Morris' opinion, the Commissioner highlights that she performed a one-time evaluation and that the results are not trustworthy because Nelson may not have been giving her full effort during the evaluation. The Court agrees that Morris' cautionary note regarding Nelson's effort during the exam must be considered. However, . . . the ALJ must provide an explanation that allows the Court to follow its reasoning. The ALJ has not done so." (citations omitted)).

Finally, the Commissioner suggests that because SSR 06-03p states that "there is a distinction between what an ALJ must consider and what the ALJ must explain in his decision" with regard to opinions from other sources, the ALJ did not commit error in this case. (Def.'s Mem. in Supp. at 10–11). The Court does not agree. The Commissioner fails to account for the entirety of the standard articulated in SSR 06-03p, which, as noted above, provides that an ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise

---

[14]     To the extent Dr. Chatterton's treatment notes are illegible in certain places, the Court notes that the ALJ has a duty to fully and fairly develop the record.

ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." 71 Fed. Reg. 45593-03, 45596. Here, the ALJ's analysis demonstrates that he did not consider Dr. Chatterton's opinion based on a misunderstanding of the record, and therefore, the ALJ did not properly consider or address Dr. Chatterton's opinion. For the reasons stated above, this failure requires remand. *Nelson*, 2012 WL 7761489, at *13 ("When opinion evidence from 'other sources' is not properly considered, remand is appropriate."); *see also Taylor*, 899 F. Supp. 2d at 90 (remanding where ALJ's evaluation of other medical source was unclear and prevented court from determining whether decision to afford significant weight to the other medical source was supported by substantial evidence).

Because the Court concludes that the ALJ's failure to properly consider Dr. Chatterton's opinion warrants remand and because on remand the ALJ must properly consider and explain his treatment of this opinion, the ALJ must reevaluate the evidence in this case, including the weight afforded to the medical opinion evidence.[15] *See* 20 C.F.R. § 404.1527(c)(4) (noting that

---

[15]     This also includes the ALJ's determination regarding Taillefer's credibility and the ALJ's treatment of the opinions of Julie Taillefer as outlined in her third party function report. *See* 20 C.F.R. § 404.1529(c)(1), (4) (stating that when "evaluating the intensity and persistence of [a claimant's] symptoms," it is necessary to consider "all of the available evidence" including "statements . . . from . . . other persons about how [the] symptoms affect" the claimant and that consideration will be given to "the extent to which there are any conflicts between your statements and the rest of the evidence, including . . . statements by . . . other persons about how your symptoms affect you."); (Admin. R. at 256–63); (Taillefer's Mem. in Supp. at 28–32).

    With respect to the ALJ's analysis of the opinions of Julie Taillefer, the Court notes that the ALJ gave her opinions "less weight" because she is not an acceptable medical source and because her relationship with Taillefer is "personal and subjective rather than professional and objective," making her opinions "presumptively biased." (Admin. R. at 19). Taillefer's argument regarding this analysis is rather minimal, but the Court notes that there appears to be some inconsistency among courts regarding the appropriateness of such reasoning. *Compare Caldwell v. Astrue*, 804 F. Supp. 2d 1098, 1104 (D. Or. 2011) ("[T]he alleged bias [of] a family member is not a valid reason for rejecting lay testimony. In order to discredit a third party statement because of 'secondary gain' or bias, the ALJ must point to evidence that the third party exaggerated symptoms in order to procure benefits."(citation omitted)) *with Henze v. Colvin*, No. C14-2035,

evaluation of medical opinion evidence depends in part on how consistent the opinion is with the record as a whole); *see also* 71 Fed. Reg. 45593-03, 45595 (noting that opinions from other medical sources "may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions"); *cf. Carlson*, 2010 WL 5113808, *16 (noting that because the ALJ did not properly weigh and assess the opinions of claimant's treating physician, it was necessary that "all the medical evidence be reweighed on remand" including other medical opinions). The Court therefore does not address Taillefer's other allegations of error related to the ALJ's RFC analysis, including the weight afforded to the various medical opinions of record. *See Taylor*, 899 F. Supp. 2d at 87, 90.

While the Court does not engage in a detailed discussion of the weight afforded other opinion evidence, the Court notes that as with the opinion of Dr. Chatterton, Dr. Golden's January 23, 2012 opinion demonstrates that Dr. Golden affirmed that he was aware that Taillefer was insured for social security coverage through March 31, 2011, and affirmed that, in addition to assessing Taillefer's current functioning, his assessment represented Taillefer's abilities on or before March 31, 2011, Taillefer's DLI. (Admin. R. at 687–88, 690–91, 694). Therefore, to the extent the ALJ's assessment of Dr. Golden's opinion was influenced by his misunderstanding with regard to the time period about which Dr. Golden was opining, this misunderstanding should be remedied on remand. In addition, while the ALJ assigned significant weight to Dr. Hadden and Dr. Phibbs in part because their opinions "are not contradicted by any treating

---

2015 WL 1600742, at *16–17 (N.D. Iowa Apr. 8, 2015) (rejecting claimant's argument that third-party statements were improperly discredited when ALJ gave reasons for discrediting those statements, including that "by virtue of the relationship with" the claimant, the third parties could not be "considered disinterested third party witness[es]").

source," this does not appear to be accurate in light of the opinions offered by Dr. Golden. *See* (Admin R. at 18, 87–94, 101–07, 687). This matter should also be clarified on remand.

Finally, the Court notes that Taillefer seeks reversal and an award of benefits or "remand . . . to the administrative level" for the evaluation of the evidence "under the proper standards." (Taillefer's Mem. in Supp. at 33). In light of the Court's analysis above, the Court concludes that remand is appropriate.

### B.     VE Testimony

"In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record." *Gilbert v. Apfel*, 175 F.3d 602, 604 (8th Cir. 1999). The hypothetical must "capture[] the concrete consequences of a claimant's deficiencies" to constitute substantial evidence. *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997). Taillefer argues that the ALJ's hypothetical to the VE did not reflect all of his limitations and was therefore improper. (Taillefer's Mem. in Supp. at 33). This argument is tied to his earlier arguments that the ALJ failed to properly weigh various opinions of record. (*Id.*). Given the Court's conclusion that the ALJ failed to properly consider the opinion of Dr. Chatterton, the Court cannot be certain that the hypothetical posed to the VE and relied on by the ALJ accurately reflects all of Taillefer's limitations. *See Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998). After properly considering the opinion of Dr. Chatterton and reassessing any other matters necessitated by the Court's analysis above, the ALJ must determine Taillefer's RFC and ensure that a VE is presented with hypothetical questions that accurately reflect that RFC.

Taillefer also asserts that VE's answer to the ALJ's hypothetical cannot constitute substantial evidence on the record as a whole to support the ALJ's finding at step five of his sequential analysis because the VE's testimony was in conflict with the DOT and because the

ALJ never addressed the conflict as required by Social Security Ruling 00-4p. (Taillefer's Mem. in Supp. at 33). While the Court has already determined that remand is required, the Court finds it appropriate to address this issue, as it may be instructive on remand.

An ALJ has "an affirmative responsibility to ask about any possible conflict between" the vocational expert's testimony and the DOT. *Renfrow v. Astrue*, 496 F.3d 918, 920–21 (8th Cir. 2007). "When there is an apparent unresolved conflict between VE . . . evidence and the DOT," the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." *Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence & Other Reliable Occupational Information in Disability Decisions*, SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). "Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict," but the ALJ "must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on" the VE's testimony rather than the information in the DOT. *Id.* An ALJ's failure to follow SSR 00-4p is harmless when "no such conflict appears to exist." *Renfrow*, 496 F.3d at 921.

The Court has reviewed the transcript of the hearing before the ALJ and the ALJ's decision and concludes that any failure by the ALJ to comply with SSR 00-4p is harmless because no apparent conflict exists. Taillefer's argument is difficult for the Court to address because while Taillefer cites several pages of the record and SSR 00-4p, he does not specify the alleged conflict between the VE's testimony and the DOT, or cite the DOT or any relevant authority that would help the Court discern the alleged conflict and address the substance of his allegation of error. *See* (Taillefer's Mem. in Supp. at 33). Based on the Court's review of the record, however, it appears that the alleged conflict between the VE's testimony and the DOT to

which Taillefer refers is based on the ALJ's inclusion of a limitation for "non-complex tasks, such as tasks that can be learned by observation or demonstration, and which can be learned within thirty days," and the VE's testimony that a person with these limitations can perform jobs with an SVP of 2. *See* (Admin. R. at 16); (Taillefer's Mem. in Supp. at 19) (stating in factual background section that representative argued that "if limited to non-complex jobs which could be learned by observation or demonstration, the jobs identified by the VE do not fit the hypothetical and conflicted with" the DOT). The Court finds no conflict.

As noted, the "SVP" level of a job reflects the amount of **time** needed to acquire the necessary information and facilities to perform that job. *Martise v. Astrue*, 641 F.3d 909, 920 n.7 (8th Cir. 2011) ("The SVP level listed for each occupation in the [DOT] connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance." (internal quotation marks omitted)). To the extent Taillefer contends that there is a conflict between the DOT and the VE's testimony that he could perform jobs with an SVP of 2 with the above limitations, the Court disagrees. The ALJ's hypothetical properly reflects the time required to acquire the necessary information and facilities to perform an SVP 2 job: The ALJ limited Taillefer to jobs that could be "learned within thirty days," which is consistent with SVP 2 jobs that can be learned in any time frame "beyond **short** demonstration **up to and including 1 month**." (Admin. R. at 16); DOT, *App. C: Components of the Definition Trailer*, Part II (emphasis added).

Taillefer may be asserting that there is a conflict because the ALJ limited him to "non-complex tasks, such as tasks that can be learned by observation or demonstration" and because this precludes work with anything more than level one GED reasoning, math, and language requirements, which would in turn preclude jobs at the SVP 2 level. *See* (Taillefer's Mem. in

Supp. at 19); (Admin. R. at 16, 111); *see also* DOT, *App. C: Components of the Definition Trailer*, Part III. Taillefer does not cite any authority to suggest that these limitations and the VE's responsive testimony created a conflict with the DOT, and the Court's independent research suggests that no such conflict exists. *See Renfrow*, 496 F.3d at 921 (concluding that limitation that the claimant cannot "do complex technical work" was not inconsistent with jobs that "require a [GED] reasoning level of three"); *see also Cross v. Astrue*, No. 08-cv-0425, 2009 WL 3790177, at *8 (N.D.N.Y. Nov. 12, 2009) (concluding that claimant was properly limited to jobs with SVP 1 or SVP 2 and finding that jobs with a GED reasoning level of 2 or 3 "are not incompatible with the non-exertional limitations" that claimant's "work must be simple, low-stress, and entry-level, with no complex decision-making, no planning, scheduling or report writing, no multi-tasking, little change in the work environment, and infrequent interaction with the public or co-workers"); (Admin. R. at 21) (finding that Taillefer could perform job of "fast food worker (DOT #311.472-010)" which has a reasoning level 2, math level 2, and language level 2); DOT, *App. C: Components of the Definition Trailer*, Part III (stating that reasoning level 2 requires applying "commonsense understanding to carry out detailed but uninvolved written or oral instructions" and dealing "with problems involving a few concrete variables in or from standardized situations").

For the reasons stated above, the Court concludes that any error due to the ALJ's failure to comply with the requirements of SSR 00-4p was harmless because there is no apparent conflict between the VE's testimony and the DOT. *Renfrow*, 496 F.3d at 921.

## IV. CONCLUSION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Wayne P. Taillefer's Motion for Summary Judgment [Doc. No. 20] be **GRANTED** as to remand, and **DENIED** to the extent Taillefer seeks reversal for an award of benefits; and

2.      Carolyn Colvin, Acting Commissioner of Social Security's Motion for Summary Judgment [Doc. No. 22] be **DENIED**.

Dated: January 28, 2016

*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

**Notice**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.